People v Prado (2004 NY Slip Op 50082(U))

[*1]

People v Prado

2004 NY Slip Op 50082(U)

Decided on January 7, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 7, 2004

Supreme Court, New York County
 THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff
against
IRVING PRADO AND ROBERT MELENDEZ, Defendants.
Ind. No. 2798/03

MARCY L. KAHN, J.
EDITED FOR PUBLICATION
Defendants Irving Prado and Robert Melendez are jointly charged by indictment with criminal possession of a controlled substance in the first degree (P.L. §220.21[1]), criminal possession of a controlled substance in the third degree (P.L.
§220.16[1], criminally using drug paraphernalia in the second degree (P.L. §220.50[2]) and criminally using drug paraphernalia in the second degree (P.L. §220.50[3]). Pursuant to the August 21, 2003 order of the Honorable Daniel FitzGerald, this court held a Mapp/Huntley/Dunaway hearing for defendant Prado in combination with a Mapp hearing for defendant Melendez on October 23, 24, November 14, 21 and December 8, 2003. Memoranda and supplemental memoranda were submitted by the People and by defendant Prado, and oral argument was had by all parties. Based upon the entire record of proceedings, I make the following findings of fact and reach the following conclusions of law.
I. FINDINGS OF FACT
A. Credibility
The People called two witnesses, Police Officer Rashford Dean, an eleven-year veteran of the Police Department, assigned to Manhattan North Borough Anti-Crime Unit, and Sergeant Robert Abramson, who was assigned to the same command and has been with the Department for nine years. Each of them had been involved in hundreds of arrests while on the force and had received Special Narcotics Enforcement Unit training in the recognition and packaging of drugs for sale on the street. There is no evidence that either of them had any special training or experience in visually estimating the speed of vehicles, however.
Defendant Prado offered the testimony of Barry Oumar Bailo, a 31-year old immigrant from Guinea who has worked for the past three years as a livery cab driver. No other witnesses were called by either defendant.
I found the testimony of the officers credible to a degree, except to the extent their testimony was contradicted by the civilian witness, Bailo, or unsupported by logic. Regrettably, I find that several factors, each of which is described in greater detail infra, combined to diminish the officers' credibility in significant respects. First, a dearth of detail about their observations of the conduct which prompted their action left this court with only vague, conclusory characterizations upon which to base its determinations. Second, the officers' repeated insistence [*2]on employing the exact same terminology to describe observations necessary to justify their actions (i.e., in stopping the livery cab due to its "excessive speed," frisking the defendants based in large part on Melendez being "very fidgety," and conducting a warrantless search of the plastic bag due to an unsupported fear of the presence of a weapon) suggested not only a joint preparation, but also a rehearsal, of their testimony, as well as an undeniable suggestion of an effort to conform their version of events to constitutional requirements. Third, both police witnesses evinced an eagerness to usurp the court's decision-making function by attempting to testify to legal conclusions, rather than to factual information, at different points maintaining that they had conducted a "search incident to a lawful arrest" (Tr. Oct. 23, 2003, at 23 [Dean]; Tr. Oct. 24, 2003, at 99 [Abramson]). Fourth and finally, the reasons the officers proffered for their actions in stopping the vehicle and frisking the defendants were belied by their own testimony about their ensuing conduct. The behavior of the defendants consisted of innocuous movements, nervous conversation, total compliance with the directions of the police and, ultimately, an admission by Prado of non-violent criminal conduct. These events would not likely have put these seasoned officers in fear of physical danger, nor have caused them to suspect the defendants of weapons possession.[FN1] Indeed, after frisking the defendants, Abramson felt "comfortable" enough to leave them sitting on the cab's rear bumper (Tr. October 24, 2003, at 129 [Abramson]), next to each other, unhandcuffed, without drawing his gun, physically restraining the two men, or even standing directly in front of them. The officers' claimed fear of weapons thus appears rather disingenuous and tailored to meet constitutional objections, further diminishing their credibility.
By contrast, I found Mr. Oumar Bailo, the livery cab driver, to be frank and forthright, displaying a clear, consistent and detailed recollection of the events of the night in question. He had no connection to either defendant: he neither knew the defendants nor was able to recognize them in court. He was not interviewed by the defense attorneys prior to appearing in court, as he refused to meet with them at their offices in advance of the hearing. Upon his arrival in court pursuant to subpoena, Bailo's inability to speak much English beyond the basic terms necessary for his work prevented counsel from conversing with him and preparing him to testify favorably for the defense.
Further, Bailo had absolutely no interest in the outcome of the proceedings, as he was never charged with the traffic violation (speeding) which allegedly prompted the stop, and so had no motivation to deny its occurrence. Indeed, he freely admitted that he had assumed that the stop was occasioned by his conceded commission of an unrelated, uncharged traffic infraction (a broken headlight). With respect to his speed, he offered that he understood the speed limit to be 30 miles per hour and indicated that he never drives faster than 34 miles per hour, a speed which he apparently, albeit incorrectly, assumes saves him from being ticketed by police. Bailo appeared to lack any appreciation of the legal principles at issue in this proceeding, and actually exhibited an unsophisticated candor which enhanced his credibility.
To the extent that some of his testimony, regarding the TRIP decal and the extent of his own clean driving record, may have appeared to be inconsistent, I am aware that, even with the assistance of the court's official French West African interpreter, Bailo was not testifying in his [*3]first language, which is Fulani, and may have become confused at points. (Tr. Nov. 21, 2003, at 228). He nonetheless answered the substantive questions at the hearing in a forthright, if not particularly articulate, fashion. Thus, where it departs from the officers' version of events, I credit Bailo's testimony.
B. Factual Determinations
On May 10, 2003, Barry Oumar Bailo was driving a 1994 Lincoln town car operating as a livery cab for Easy Way car service during the early morning hours, which was his usual shift with the company, in East Harlem. At 112th Street and Madison Avenue he picked up Irving Prado and Robert Melendez, who asked to be taken to Sherman Avenue in the Bronx.
 At the same time, Officer Rashford Dean and Sergeant Robert Abramson were working as partners in Manhattan Borough Anti-Crime, patrolling in plain clothes in an unmarked car in East Harlem. They had just concluded a 5:20 p.m. to 2:00 a.m. anti-crime shift and were commencing an overtime "taxi conditions duty" assignment, in which they would continue patrolling in order to conduct safety inspections of livery taxicabs which had agreed to participate in the Police Department's Taxi/Livery Robbery Inspection Program (TRIP). The program's guidelines provide that the police may stop cabs displaying a TRIP decal at any time for a brief inquiry of the driver and a visual inspection of the vehicle, and they must keep a detailed log of all the TRIP stops they conduct. Upon being stopped, a cab driver may consent to the police opening the passenger compartment doors, although passengers may not be removed from the vehicle unless independent factors cause the officers to fear for their own safety.
The officers were traveling slowly northbound on Madison Avenue in the vicinity of East 115th Street when they observed Bailo's livery cab, with defendants Melendez and Prado in the back seat, pass them. Traffic was light, and the livery cab was the only vehicle in their immediate area at the time. Dean and Abramson testified that they decided to stop the vehicle because of its "excessive speed," notwithstanding the fact that they were not on traffic patrol, primarily to check on the safety of the driver, and secondarily, to caution the driver to slow down. Dean testified credibly that they never intended to issue a traffic summons to the driver, but were making an investigative check on the safety of the driver. Had the stop not produced evidence of crime, Dean and Abramson explained, they would not have issued a traffic summons to the driver but would merely have given him a warning about his speeding. Although Dean and Abramson were patrolling with the intention of stopping livery cabs which had elected to participate in the TRIP program, their decision to stop the town car was made without any awareness of whether the vehicle bore a sticker indicating that it was a TRIP program registrant and had thus given prior consent to be stopped by police for such safety checks.
Dean pursued the cab for approximately seven blocks using the flashing grille lights but no siren until the cab pulled over at 122nd Street and Madison Avenue. Bailo, who testified that he always complied with the directions of the police, pulled his cab over as soon as he became aware that Dean was attempting to stop him.
The testimony is in conflict as to the rate of speed the livery cab was traveling at the time the officers first observed it and finally succeeded in pulling it over. According to Dean, the speed limit in that area was 40 or 45 miles per hour. (Tr. Oct. 23, 2003, at 31 [Dean]). Although their vehicle was not equipped with a radar speed detection device, Dean and Abramson both testified that when they first observed Bailo's car, it was traveling "at an excessive rate of speed." (Tr. Oct. 23, 2003, at 17, 30 [Dean]; Tr. Oct. 24, 2003, at 93 [Abramson]). Neither officer was able to estimate the speed of Bailo's vehicle as it passed by them or as they pursued it.
[*4]
Nor did either police witness offer any foundational support for his ability to visually estimate the speed of a moving vehicle accurately, either in terms of formal training or experience while on the force. When asked to detail the training he had received in making traffic stops, Dean mentioned only the danger inherent in such actions and the need to maintain close surveillance of all vehicle occupants to assure the safety of the situation. There was no evidence that either Dean or Abramson had paced the livery cab for any distance at 55 miles per hour, or at any rate in excess of the speed limit for that area, using the speedometer of their own car. Dean merely stated that he judges vehicle speed by determining how fast he has to drive in order to intercept the other vehicle. He testified that from his own slow, initial speed, he had to travel at a rate of at least 55 miles per hour for an undisclosed distance in order to catch up to the livery cab, which he acknowledged was necessarily moving more slowly than the police vehicle. Dean did not state how long he had to maintain that speed in order to reach the cab, nor is there any evidence in the record of exactly how slowly the police car was proceeding when it first began to follow the cab. Although the cab did not stop at any of the cross-streets between 115th Street and 122nd Street, there was no evidence that Bailo ran any red lights or committed any other traffic infractions prior to being pulled over.
 Bailo, on the other hand, repeatedly, and emphatically, maintained that he was not speeding during his trip with the defendants. He testified that as he drives his daily 8 to 10-hour shifts, he usually consults his speedometer to check his speed, because in his driving experience in New York City, there are numerous speed limit signs reflecting the speed limit of 30 miles per hour, and he does not wish to receive a ticket. Although he did not consult his speedometer as he drove between 112th and 122nd Streets, he was confident that he did not exceed 30 to 34 miles per hour. He testified that after stopping to pick up the defendants at 112th Street, he did not attain full speed again until he reached 116th Street. He offered this assessment presumably without any awareness of the point at which the officers claimed to observe him speeding. He stopped his vehicle upon seeing the police car's flashing grille lights, thinking at the time that he had been stopped due to a problem with his front headlight.
I do not find credible the police witness' contentions that they followed the cab and pulled it over because they observed it exceeding the speed limit. First of all, I do not believe that the officers had enough information to know the speed of the livery cab, as they were without any radar device and did not pace the taxi for any distance against an accurately calibrated speedometer or other device. Neither officer offered an estimation of the cab's speed, but merely resorted, repeatedly, to the same general conclusion, in identical language, that the cab was traveling "at an excessive rate of speed." Secondly, as noted above (see §I.A., supra), this repeated testimony by both officers in haec verba detracts from their credibility, both on this subject and generally.
Furthermore, on this record, there is no clear indication of what the legal speed limit was on Madison Avenue between 115th and 122nd Streets on May 10, 2003.[FN2] Dean testified only [*5]that he thought it was either 40 or 45 miles an hour. Dean admitted that, if he traveled at a speed of 55 miles per hour in order to catch up to the cab, then the cab would have had to have been moving at a speed less than 55 miles per hour. Regardless of the actual speed limit, Dean could not have had reasonable cause to believe that the cab was exceeding what he believed the speed limit to have been, i.e., 40 or 45 miles per hour, according to the evidence presented. To accept Dean's testimony on this point, I would have to find that Dean, whose ability to accurately estimate speed visually was not demonstrated on this record, could determine by his visual observation alone, and actually believed in good faith, that the livery cab was moving at more than 45, but less than 55, miles per hour. The evidence before me provides no basis to believe that Officer Dean could draw such a fine distinction, notwithstanding his established experience and training in investigation of narcotics offenses and robberies, especially given his own disclaimer of responsibility for traffic enforcement duties. A fortiori, adopting Bailo's testimony that the speed limit was 30 miles per hour and he was traveling at no more than 34 miles per hour, to credit the officers' contention that they perceived that Bailo was traveling at an excessive speed, one would have to accept the highly improbable proposition that Dean was able to discern the resulting 4 mile-an-hour traffic violation unaided by a radar or other mechanical device. Additionally, no evidence was offered to establish that the speed of 55 miles per hour which Dean claimed to have reached in the pursuit, and upon which the People place great reliance, was based upon a sustained reading of a speedometer of demonstrated accuracy. (See §II.C., infra).
Moreover, I find more persuasive Bailo's testimony that he was traveling at a rate of speed of 30 to 34 miles per hour. He was emphatic and consistent on that point, and would have had no reason not to reveal an instruction from his clients to speed, either on the scene or during his testimony, had he in fact received one.
Finally, I cannot accept the notion that the officers believed in good faith that they had probable cause to stop the cab for speeding, given their behavior at the time of the stop. Although it is assuredly within the officers' discretion whether or not to issue a summons to the driver of a speeding automobile, their failure here either to issue a traffic summons or to provide the driver with the warning which was among their claimed purposes of the stop belies their claim that Bailo was driving excessively fast. Similarly, the fact that Bailo was not asked to produce his license, insurance or registration until after the defendants had been investigated and arrested suggests that these officers, who claim to have found a speeding cab driver who was in no distress of any sort, did not have a moving traffic violation on their minds when they stopped the car.
A far more probable explanation of the stop is that, knowing the neighborhood to have been the site of robberies and drug transactions in the past, and being assigned to make safety stops of TRIP livery cabs, Dean and Abramson decided to stop the only vehicle they saw on the road at that time, to check on the driver's safety.[FN3] Accordingly, I find the claim that the officers believed they had probable cause to stop the cab for a speeding violation to be unsupported by [*6]credible evidence,[FN4] and I find that in fact, the car was not speeding.
Upon pulling the cab over at 122nd Street, Dean and his partner, Sergeant Abramson, alighted from their car and approached the cab. As they did so, they observed the defendants, Robert Melendez and Irving Prado, seated in the back seat of the car, both turning, "maybe two times," to look over their shoulders in the officers' direction. (Tr. Oct. 24, 2003, at 110 [Abramson]). Prado was seated on the passenger's side of the vehicle while Melendez was seated on the driver's side. Both officers testified that they observed Prado lean over toward Melendez, as if speaking to him. As they walked toward the livery cab, Dean could see "movement" in the back seat (Tr. Oct. 23, 2003, at 17 [Dean]), which both officers described only by saying, again in identical language, that Melendez "seemed very fidgety." (Tr. Oct. 23, 2003, at 19, 71 [Dean]; Tr. Oct. 24, 2003, at 94 [Abramson]).
Dean approached the driver of the car to check on his safety, consistent with his assignment for the night. Abramson remained on the passenger side or the vehicle, near the rear door. Dean identified himself to Bailo as a police officer and displayed his shield. Dean did not request his license, registration or insurance documentation at that time, but instead asked Bailo, "What's the rush?" Whether because he did not understand Dean's inquiry or because he did not hear it through his partially opened window, Bailo did not respond. Bailo did not ask for help from the officers, and appeared in all respects normal, showing no sign of distress. He gave no indication that his passengers were involved in any kind of criminal activity.
As he spoke to Bailo, Dean glanced into the rear of the passenger compartment of the vehicle. He could see Melendez, who was wearing a waist-length jacket, make a movement to his left shoulder area, reaching his right hand on the outside of his jacket under his left arm, as if "to adjust something under his armpit." (Tr. Oct. 23, 2003, at 25, 81 [Dean]). Dean could not see any particular object or shape under Melendez's armpit. Although Melendez's movement was equally consistent with that of someone who was adjusting his jacket to make it more comfortable, Dean testified that by virtue of the unusual movement, he was concerned that Melendez might be adjusting a weapon. I do not find this testimony credible. The limited vantage which Dean had of the single movement by Melendez of his right hand under the under the left armpit portion of his jacket, viewed from the chest up, in light of the absence of any other factors suggesting that the cab's occupants were in possession of a weapon, would not likely have put him in such fear.
Dean asked the driver to allow him to check the rear of the vehicle for weapons or contraband. Although Bailo testified that he would have consented to any request made by the police, I credit his testimony that he did not understand what Dean was asking him at this point and did not respond.
Consistent with their practice on TRIP stops of removing the passengers from the car to conduct such inspections (in apparent violation of TRIP guidelines), Dean opened the rear driver's side, asking Melendez to step out of the vehicle. Melendez complied and as he did so, a plastic bag dropped from his left underarm to the ground. From his distance of approximately one foot away, Dean could see that it was a white plastic bag which was closed. Dean could not [*7]determine the contents of the bag, and neither he nor Bailo heard any unusual sound as it hit the ground. Dean then walked Melendez to the back of the vehicle. At Dean's instruction, Melendez placed his hands on his head and spread his legs apart while Dean patted him down. Finding no weapons, Dean directed Melendez to sit on the left side of the rear bumper of the car, unhandcuffed, feet apart.
Meanwhile, Abramson had been positioned next to the rear passenger door handle observing Prado. Unable to see Prado's hands as Dean spoke to the driver, Abramson directed Prado to show him his hands. Prado complied. Observing a nod from his partner, Sergeant Abramson understood that consent to search the vehicle had been obtained. He then searched the rear passenger compartment using his flashlight, but saw no evidence of contraband.
 Abramson maintained that as Melendez got out of the cab, he heard a sound of metal hitting the pavement. Abramson characterized the sound as a "clang," which he described as having been attributable to anything, from a gun to a soda can (Tr. Oct. 24, 2003, at 139).[FN5] Abramson was unaware that Melendez had dropped anything. Abramson made no mention to his partner of any concern that a weapon had been dropped, and did not seek to retrieve the item himself.
Dean and Abramson always order livery passengers out of the car sequentially when they make TRIP stops. Following their usual protocol, Abramson kept Prado under observation until Dean had directed Melendez out of the vehicle and to the rear of the car. He then directed Prado to step out of the car and brought him to the back of the vehicle. In accordance with his testimony, I find that Abramson ordered Prado out of the car based upon the nod he received from Dean, which confirmed that they would be checking the backseat in accordance with his usual practice, rather than as a result of the non-descript metallic clang he had heard.
As he got Prado out of the car, Abramson heard Prado say, "We're good guys" over and over again. Prado, who seemed nervous, also kept looking over his shoulder in the direction of Dean and Melendez. The Sergeant then conducted a frisk of Prado, which similarly produced no weapons. He then directed Prado to sit on the right side of the rear bumper with his feet apart, also without handcuffs.
After the frisk, Abramson left his position behind the cab and directly moved to the passenger side of the vehicle, approximately two feet from the tail light, while he asked Prado his name, his destination and point of origin. Prado responded to the questioning, providing the pedigree information and stating that they were going to Sherman Avenue in the Bronx from Madison Avenue and 112th Street. As both defendants remained seated on the rear bumper of the car, with Abramson to their left, Prado kept looking over his shoulder in Dean's direction as Dean, having finished with his frisk of Melendez, headed back to the area where the bag had fallen near the rear driver's side door. As Dean bent down to retrieve the bag, Prado said, "That's mine. He [Melendez] had nothing to do with it, the drugs." Abramson then asked him, "Weed?" Prado replied, "Coke." Although Dean testified that there were no questions by the officers of either defendant prior to Prado making the statements, I credit Abramson's testimony that the conversation occurred as just stated. No threats or promises had been made to either defendant at [*8]the time of Prado's statements. Neither Prado nor Melendez was in handcuffs nor physically restrained, and the officers did not have their guns drawn, although both defendants had been told not to move from their position at the rear bumper of the car.
Dean then retrieved the bag from the ground near the rear driver's side door where it had fallen. Although he could still not see its contents, on feeling the closed bag, Dean could tell that it contained illegal narcotics. He then proceeded to open the white plastic bag, which contained a black plastic bag, which was also closed. Inside the black bag were two clear plastic bags, each containing a substance which appeared to Dean based upon his training and experience, to be rock cocaine, as well as the small digital metal and plastic scale. Dean signaled to Abramson, who joined him in examining the bag. During this time the defendants remained at the rear of the town car, unrestrained, sitting on the bumper, facing away from the car. The officers then returned to the defendants and placed first, Melendez, and then Prado, in handcuffs.
Abramson then searched Prado and recovered from his left pants pocket a plastic bag containing nine smaller bags, each bearing an apple emblem, and each containing approximately one hundred smaller bags inside each of the apple bags, totaling approximately 900 smaller blue bags. He also recovered $752.00 in U.S. currency from Prado's pants pockets, along with a cellular phone. Dean searched Melendez and recovered $33.00 in U.S. currency and a small bag of marijuana.
II. CONCLUSIONS OF LAW
A. Standing
As passengers in a taxicab, defendants have standing to contest the legality of the stop of the vehicle. (People v. May, 81 NY2d 725 [1992]; People v. Millan, 69 NY2d 514 [1987]; People v. Matthew, 228 AD2d 260 [1st Dept. 1996]). Moreover, the People do not contest the defendants' standing to challenge the police action in this case. Accordingly, both defendants have standing to challenge the stop of the livery cab and any evidence obtained by the police as a result of that stop.
B. Burden of Proof
Where Fourth Amendment rights are at issue, the People have the burden of going forward to establish the legality of the police conduct in the first instance. (Dunaway v. New York, 442 US 200, 207 [1979]; People v. Wise, 46 NY2d 321 [1978]; People v. Berrios, 28 NY2d 361 [1971]; People v. Malinsky, 15 NY2d 86 [1964]). To sustain this burden, the testimony offered by the People must be credible (In re Jay R., 259 AD2d 436 [1st dept. 1999]), and not tailored to nullify constitutional objections. (People v. Carmona, 233 AD2d 142 [1st Dept. 1996]; People v. Garafolo, 44 AD2d 86 [2d Dept. 1974]).
Once the People satisfy their initial burden of going forward, then the ultimate burden of persuasion shifts to the defendant, who must demonstrate the illegality of the police conduct by a preponderance of the credible evidence. (People v. Berrios, supra, 28 NY2d at 367).
C. Legality of the Stop
The stop of an automobile constitutes a limited seizure of its occupants for federal and state constitutional purposes. (Delaware v. Prouse, 440 US 648 [1979]; People v. May, supra; People v. Ingle, 36 NY2d 413 [1975]). As such, it must be justified at its inception, and must be reasonably related in its scope and duration to the circumstances which originally prompted it. (People v. Banks, 85 NY2d 558, 562, cert. denied, 516 US 868 [1995]).
It is well-established that a police officer may not stop a vehicle merely on a hunch that an investigation might prove fruitful. Police officers may stop a vehicle to investigate a crime [*9]only where they have a reasonable suspicion that the car's occupants have been or are about to be involved in criminal activity. (People v. May, 81 NY2d 725 [1992]; People v.
Sobotker, 43 NY2d 559 [1978]). This standard requires a quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the same circumstances to believe that criminal activity is at hand. (People v. Banks, supra; People v. Sobotker, supra, 43 NY2d at 564).
The police may also stop a car upon reasonable suspicion that a violation of the Vehicle and Traffic Law has occurred. (People v. Ingle, supra, 36 NY2d at 414; see Delaware v. Prouse, 440 US 648, 663 [1979]). This requires specific, articulable facts which, together with the rational inferences arising therefrom, reasonably warrant the intrusion. (People v. Ingle, supra, 36 NY2d at 420).
Alternatively, absent any suspicion of unlawful conduct, a taxi or livery cab may be lawfully stopped if it is properly enrolled in the City's Taxi Livery Robbery Inspection Program (TRIP) and the police comply with the requirements of the program. (People v. Abad, 98 NY2d 12 [2002]).[FN6]
Finally, a car stop will be upheld, irrespective of either the primary motivation of the officer or a determination of what a reasonable traffic officer would have done under the circumstances, provided the officer has probable cause to believe that the driver has committed a traffic violation. (Whren v. United States, 517 US at 806, 809-10 [1996]; People v. Wright, 98 NY2d 657 [2002]; People v. Robinson, supra).[FN7] Absent one of these four circumstances, [*10]however, the stop of a vehicle in furtherance of a general safety check constitutes an unconstitutional restraint on its occupants. (City of Indianapolis v. Edmond, 531 US 32 [2000]; People v. Jackson, supra; Matter of Muhammad F., supra).
In the instant case, the People do not contend that this was a routine, non-pretextual traffic stop, that the police had any suspicion that the driver or the occupants of the cab had engaged in a crime, or that the stop was a valid TRIP stop. These officers were admittedly interested in pulling the cab over in order to check on the safety of the driver. They were not traffic enforcement officers, and had no intention of issuing a traffic summons. Therefore, to sustain their action in stopping the cab to conduct a suspicionless criminal investigation, absent knowledge of the driver's consent to being stopped pursuant to TRIP, Dean and Abramson were required to have possessed probable cause to believe that the cab was exceeding the speed limit. (People v. Robinson, supra; see Whren v. United States, supra).
As explained, I do not credit the officers' testimony that they had enough information to conclude that there was probable cause to believe that Bailo's cab was exceeding the speed limit. Even were I to credit the officers' testimony on this point, however, I would find the proof of probable cause for the stop legally insufficient.
In its seminal case on the subject of the evidentiary sufficiency of visual speed estimation, (People v. Olsen, 22 NY2d 230 [1968]), the Court of Appeals recognized that, in proper circumstances, the opinion evidence of police officers, uncorroborated by mechanical devices, in itself would be sufficient to sustain a conviction for speeding. In Olsen, the Court held that the witness must meet two requirements before the testimony will be held sufficient. First, the witness must demonstrate some experience in observing the rate of moving objects, or other equally satisfactory basis for the opinion. Second, the Court explained, consideration must be given to the nature of the variance between the subject's vehicle and the established speed limit. The Court explained:
A police officer's estimate that a defendant was traveling at 50 to 55 miles per hour in a 30-mile-an-hour zone should be sufficient to sustain a conviction for speeding. On the other hand, his testimony, absent mechanical corroboration, that a vehicle was proceeding at 35 or 40 miles per hour in the same zone might for obvious reasons be [*11]insufficient, since, it must be assumed that only a mechanical device could detect such a slight variance with sufficient accuracy to satisfy the burden necessary to sustain a conviction.
(Id., 22 NY2d at 232).
Accordingly, in the more recent case law, convictions have been upheld where the observing officer's extensive training and experience in speed estimation had been established and the divergence from the actual speed limit was determined to be 15 miles per hour (People v. Knight, 72 NY2d 481 [1988]); where the officer testified to his expertise in visually assessing vehicle speeds (Al-Habishi v. Department of Motor Vehicles, 309 AD2d 641 [1st Dept. 2003]); where the officer who effectuated the stop testified to having received specialized training in both visual estimates of speed and the use of radar devices for speed detection, and had determined during the pursuit that the driver was traveling at 51 miles per hour in a 30-mile-an-hour zone (Matter of Howe v. Adduci, 226 AD2d 377 [2d Dept.], lv. den., 88 NY2d 814 [1996]); where the police testimony was that the driver proceeded at 90 miles per hour in a 50-mile-per-hour zone (Matter of Hirsch v. Department of Motor Vehicles, 182 AD2d 761 [2d Dept. 1992]; see DeOliveira v. Department of Motor Vehicles, 271 AD2d 607 [2d Dept. 2000]); and where the officer opined that the defendant was traveling at twice the legal speed limit (Matter of Martin v. Adduci, 138 Ad2d 599 [2d Dept. 1988]). Admission of testimony regarding vehicle speed in the absence of an appropriate foundation has been held to be error. (People v. Smith, 162 AD2d 999 [4th Dept.], lv. denied, 76 NY2d 896 [1990]).
While Olsen involved the quantum of evidence necessary to sustain a conviction for speeding, namely proof beyond a reasonable doubt,[FN8] courts determining the sufficiency of opinion evidence of speed at suppression hearings may surely rely on more flexible standards in judging the sufficiency of evidence before them. Nonetheless, this court's review of the few available reported opinions evaluating the sufficiency of evidence of vehicle speed at suppression hearings suggests that visual estimates of speed, without more, are insufficient to establish probable cause to stop a vehicle.
In a case strikingly similar to the one at hand, People v. Mandato, 195 Misc2d 636 (App. Term, 2d and 11th Jud. Dist.), lv. denied, 100 NY2d 563 (2003), the Appellate Term reversed a denial of a defendant's Dunaway motion, holding that the probable cause standard for a pretextual stop of a vehicle under Robinson, supra, and Whren, supra, had not been met. In Mandato, an officer without any training in the visual estimation of vehicle speed had testified that he had observed the defendant traveling at a speed of ten to fifteen miles per hour, based upon his speedometer, the accuracy of which had not been demonstrated and which he acknowledged could have been inaccurate. As the officer's testimony that "maybe" the speed limit was 30 miles per hour was not corroborated with any evidence of an actual minimum speed limit at the location in question, the court held that the evidence failed to establish that the officer had probable cause to stop the car, and granted the Dunaway motion.
Similarly, in the instant case, Officer Dean demonstrated no experience or background in estimating automobile speed. When questioned about his training in traffic stops, he referenced [*12]safety, not the ability to identify traffic infractions. He repeatedly explained that his assignment was not traffic enforcement, but rather livery cab safety and robbery prevention. When asked how he judged vehicle speed, he indicated that he relies on his speedometer to identify the speed his own car must travel to catch up to the other vehicle. Further, there was no evidence of the accuracy of his speedometer, nor was there proof that Dean had used it to pace Bailo's cab for any specified distance to determine the vehicle's speed. And Dean could do no more to establish the speed limit in the area that to say that he "believe[d] it's either 40 or 45 miles." (Tr. Oct. 23, 2003, at 31 [Dean]). These facts essentially replicate those in Mandato and compel the same result reached there.[FN9] It is assuredly legally insufficient to predicate a finding of probable cause to stop a vehicle on a speeding violation, where neither the speed of the vehicle nor the legally established speed limit is known.
Cases upholding car stops based upon officers' visual estimations of speed are all distinguishable from the instant case. In People v. Gooden, 111 AD2d 871 (2d Dept. 1985), upon which the prosecution places heavy reliance, the officer more precisely described the excessive speed of the vehicle by testifying that it was traveling at a speed at 50 to 60 miles per hour. In addition, although the officer was then on anti-crime duty, his experience in assessing the speed of moving vehicles was demonstrated by foundational testimony that he had issued some 50 speeding tickets during his nine years on the force. While not dispositive, the credibility of the officer's claim of excessive speed in Gooden was also enhanced by his issuance of a speeding ticket for the violation.
Furthermore, Gooden is inapposite for present purposes, as the Appellate Division, Second Department there, ruling prior to Robinson and Whren, rejected a defense claim that the appropriate standard for the stop was probable cause, and relied in its decision upon People v. Singleton, 41 NY2d 402 (1977), and People v. Ingle, supra, both of which apply the lesser standard for traffic stops of reasonable suspicion of a violation of law. Similarly reliant on the reasonable suspicion standard to uphold stops based upon visual estimates, and thus not germaine to the present inquiry, are People v. Saylor, 166 AD2d 899 (4th Dept. 1990), lv. denied, 77 NY2d 966 (1991), where despite the absence of details of the officer's training, the stop was upheld as based upon reasonable suspicion where a radar unit of unknown accuracy clocked the driver's speed at 54 miles per hour, and People v. Moore, 277 AD2d 254 (2d Dept. 2000), lv. denied, 96 NY2d 761 (2001), where the officer had paced the driver's speed at 74 miles per hour and had observed him make an unsafe lane change.
For these reasons, even were I to credit the testimony of the officers, I would find, based upon that very testimony, that the proof was legally insufficient to support their contention that they had probable cause to stop the livery cab for exceeding the speed limit. Accordingly, both because I do not credit the officers' claim of having discerned excessive speed, and because, in any event, I find that claim to be legally insufficient on this record, I find that the People have failed to meet their burden of going forward to establish that the stop of the livery cab by Officer Dean and Sergeant Abramson met the constitutional requirements of being based upon probable cause to believe the cab was speeding.
D. Application of the Exclusionary Rule
[*13]
The exclusionary rule is "a judicially created remedy intended as a means of discouraging police misconduct." (People v. Castillo, 80 NY2d 578, 583 [1992] [citing Stone v. Powell, 428 US 465, 486 (1976)]). It has long been employed to prevent the use at trial of prosecution evidence which has been obtained as a direct result of police action which violates the Fourth Amendment. (See Mapp v. Ohio, 367 US 643 [1961]; Weeks v. United States, 232 US 383 [1914]). Because the rule does not serve any "truth-seeking" function (People v. Castillo, supra) and exacts a "heavy price" on society by interfering with the public's right to have the guilt or innocence of a criminal defendant determined based upon all available evidence, however, it is only applied to suppress "evidence which '"has been come at by exploitation of that illegality."'" (People v. Arnau, 58 NY2d 27, 32 [1982] [quoting Wong Sun v. United States, 371 US 471, 488 [1963] [further citations omitted]).
Applying the exclusionary rule to suppress such "fruit of the poisonous tree" (Nardone v. United States, 308 US 338, 341 [1939]) requires a determination that the evidence to be suppressed must have been discovered not merely subsequent to the unlawful police conduct, but also as a direct result of it. (People v. Arnau, supra; People v. Rogers, 52 NY2d 527, 534 [1981]). The burden is on the defendant who seeks suppression pursuant to the rule to demonstrate that the acquisition of the evidence was causally related to the police misconduct (People v. Arnau, supra, 58 NY2d at 34), and was not obtained by "'means sufficiently distinguishable to be purged of the primary taint.'" (Nardone v. United States, supra, 308 US at 487-488 [quotation omitted]).
Here, defendants have met that burden. Not only did the police actions in acquiring the evidence of Prado's statements, the plastic bag dropped by Melendez and the items seized from the persons of each of the defendants occur within a very few minutes of the illegal stop of the livery cab, but each of those actions was the direct result of the stop of the car, and would not have occurred without it. There was no intervening circumstance which led to the revelation of any of this evidence to the police; rather, it unfolded in one continuous and unbroken chain of events. Indeed, although I need not decide the issues given my findings, the behavior of the police here, in conducting frisks of the defendants, based solely on their innocuous movements and nervous conversation, and without reasonable suspicion that they were armed or dangerous (see People v. Banks, supra); in feeling the plastic bag and opening it, despite determining that it was not a weapon (People v. Diaz, 81 NY2d 106 [1993]; People v. Brooks, 65 NY2d 1021 [1985]); and in opening the plastic bag, which was in the exclusive possession of the police and not on the person of either defendant, without having a reasonable belief that the defendants could gain possession of a weapon from it or be able to destroy evidence inside it, and doing so prior to placing the defendants under arrest (see People v. Gokey, 60 NY2d 309 [1983]), suggests that all of their actions flowed from the same initial and improper source, that being the desire to investigate the possibility of criminal activity without having a legal basis for doing so. The taint of the illegal stop never became attenuated, nor is there any basis for concluding either that the drugs and other contraband would have been independently discovered, or that the items seized were not recovered by exploitation of the primary illegality. (See People v. Millan supra, 69 NY2d at 521, citing Wong Sun v. United States, supra, 371 US at 488). Moreover, given the repeated violations of defendants' rights in this case, there is a solid public policy basis for application of the exclusionary rule and its deterrent purpose. (People v. Arnau, supra). Accordingly, all of the aforementioned evidence acquired as a result of the car stop must be suppressed.
III. CONCLUSION
[*14]
Due to the violation of their Fourth Amendment rights and rights under article I, section 12 of the New York State Constitution, the Mapp and Dunaway motion of defendant Prado, as well as the Mapp motion of defendant Melendez, are granted. As to defendant Prado, suppression is ordered of both of his statements to Sergeant Abramson; of the plastic bag containing alleged cocaine; and of the small plastic bags, U.S. currency and cellular phone recovered from his pants pockets. As to defendant Melendez, suppression is ordered of the plastic bag containing alleged cocaine; of the small plastic bags recovered from the co-defendant; and of the U.S. currency and small bag of marijuana recovered from his person.
The foregoing constitutes the decision, opinion and order of this court.
Dated: January 7, 2004
 New York, New York
Decision Date: January 07, 2004
Footnotes

Footnote 1:1 Abramson conceded that while the defendants were in the cab, he had no reason to believe that either defendant was in possession of a gun. (Tr. Oct. 24, 2003, at 140).

Footnote 2:2 While the court could take judicial notice of 34 NYCRR 4, §4-06(a)(1), which establishes a speed limit of 30 miles per hour in New York City unless posted otherwise, there is no evidence in the record of the presence or absence of any signs on that portion of Madison Avenue reflecting a deviation from the generally applicable limit.

Footnote 3:3 The People forthrightly do not seek to justify the stop pursuant to the TRIP program, given their failure of proof on that issue, including the fact that the officers did not maintain a detailed log of the stop as a TRIP stop.

Footnote 4:4 As explained in my conclusions of law, I also reach legal conclusions which necessitate the rejection of the People's contention that the cab was stopped for a speeding violation. (See §II.C., infra).

Footnote 5:5 The only item in the bag which could have made noise on falling was the plastic and metal scale, which measured approximately one to two inches thick, six to eight inches long, and three to four inches wide. (Def. Prado's Exh. A).

Footnote 6:6 The officers testified that they routinely order passengers out of cabs pursuant to TRIP program stops after obtaining the "consent" of the driver, since it was necessary "in order to check the back" of the cab. (Tr. Oct. 23, 2003, at 34 [Dean]). Assuming that the TRIP stops referenced are not based upon reasonable suspicion of criminal activity (cf. People v. McLaurin, 70 NY2d 779 [1987]; People v. David L., 56 NY2d 698 [1982]; People v. Sobotker, supra) or probable cause to believe traffic infractions have been committed (People v. Mundo, 99 NY2d 55 [2002]; People v. Robinson, 97 NY2d 341 [2001]; Maryland v. Wilson, 519 US 408 [1997]), such conduct would appear to violate the New York State Constitution. (See People v. Jackson, 99 NY2d 125 [2002]; People v. Abad, supra; People v. Robinson, supra; Matter of Muhammad F., 94 NY2d 136 [1999]; People v. Ingle, supra). 

Footnote 7: 7 Although not raised by the parties and not at issue in this case, it bears noting that the probable cause standard employed in Robinson and Whren should not, in this court's view, be seen as an abandonment of the rule of Ingle and Prouse that police may stop a vehicle when they possess reasonable suspicion to believe the driver has committed a traffic violation. Nothing in Robinson or Whren even hints at such a global change in this well-established principle, and in neither of those cases was the requisite standard of proof of the traffic violation at issue. Had either of these Courts intended to change this long-standing constitutional standard, the issue, in all probability, would have been addressed directly.
Accordingly, the only reasonable reading of those two cases' standard is that each, respectively, announced the insignificance of an officer's pretextual investigative motive in circumstances where probable cause exists to believe that the motorist violated traffic laws. In this court's view, and apparently in the view of the Appellate Division, Fourth Department, (see People v. Nesbitt, 1 AD3d 889 [4th Dept. 2003] [citing Robinson]; People v. Wilcox, 295 AD2d 914 [4th Dept.], lv. denied, 98 NY2d 703 [2003]), where an officer seeks to stop a vehicle solely to enforce traffic laws, the quantum of evidence the officer must possess to justify such action subsequent to Robinson and Whren remains reasonable suspicion that the motorist has committed a violation of the Vehicle and Traffic Law.

Footnote 8:7 The standard of review of agency conduct in the cited cases which are Article 78 proceedings, however, is whether the agency's determination was supported by substantial evidence.

Footnote 9:8 At issue in Mandato was the existence of a minimum speed limit pursuant to VTL §1181(b), but that distinction is insignificant for purposes of this analysis.